IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIN RILEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 03 C 5868 |
| ) | |
| ) | Judge Mark Filip |
| OFFICER JEAN BARKSDALE AND ) | |
| OFFICER VARGAS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Erin Riley ("Riley" or "Plaintiff") brings this action against Officers Jean Barksdale ("Barksdale") and Vargas ("Vargas") (collectively, "Defendants"). Plaintiff filed a two count complaint (D.E. 1) that charges Defendants in their individual capacities with violating her rights by (1) being deliberately indifferent to Plaintiff's safety during her incarceration at the Cook County Jail ("Count I"); and (2) failing to provide her with appropriate medical care in a timely manner ("Count II").[1] Defendants have moved for summary judgment (D.E. 28). As explained below, Defendants' motion is denied.

I.  **FACTS**

A.  Preliminary 56.1 Issues

The relevant facts are taken from Defendants' Local Rule 56.1 ("L.R. 56.1") statement of facts and exhibits, Plaintiff's response to Defendants' statement of facts, Plaintiff's L.R. 56.1 statement of facts, and Defendants' response to Plaintiff's statement of facts. The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict

---

[1] The various docket entries in this case are cited as "D.E. ___."

compliance" with L.R. 56.1. *See Bordelon v. Chicago Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court, as it must, resolves genuine factual ambiguities in Plaintiff's favor. *See Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). In particular, this strict compliance means that the Court only considers those facts or additional facts that comply with L.R. 56.1.

Specifically, both parties in the instant case have, at times, failed to comply with the tenets of Local Rule 56.1(b)(3)(A) in their respective responses to the opposition's statements of facts or additional facts. (D.E. 30, 32.) In those instances where the parties failed to comply, the Court has deemed admitted those particular statements of facts that have complied with Local Rule 56.1, where they are properly supported with competent evidence. *See Malec*, 191 F.R.D. at 584 ("[A] nonmovant's failure to adhere to these requirements is equivalent to admitting the movant's case."). When denying a movant's factual allegations, "a general denial is insufficient." *Id.* Rather, "the nonmovant must cite specific evidentiary materials justifying the denial. If the cited material does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation." *Id.*

Plaintiff, by virtue of her insufficient, general denials—*i.e.*, where Plaintiff simply stated that she "denies the facts as stated" and cited to the same portion of the record that Defendants cited in their 56.1(a)(3) statement—is deemed to have admitted paragraphs 12, 13, 16, 17, 20, 21 (for the purposes of determining that Plaintiff was transported to Cermak Hospital), and

paragraph 23 (for the purpose of establishing that Plaintiff's grievance charged Harris with battery). (All of these paragraphs and statements were properly supported by evidence.) For paragraphs 10, 15, 21 (for the purpose of determining whether a nurse checked Plaintiff's eye at the dispensary), 22 (as to the month and year), and 23 (as to the charge of assault), where the cited pages undermined or did not establish Defendants' statements of fact, the statements of facts are deemed to have been properly disputed by Plaintiff.

Defendants also failed to comply with Local Rule 56.1 in several of their responses. In several instances throughout their Response to Plaintiff's Additional Statement of Facts (D.E. 32), Defendants' denial was general and unsupported. Specifically, Defendants repeatedly stated that they "deny the facts" in a particular paragraph and further asserted, without explanation, "[l]ack of foundation." (*Id.* ¶¶ 12, 16, 17, 18, 19, 21, 29, 30.) In those instances where the foundational objection appeared to have merit, the fact at issue was deemed to be disputed. (*Id.* ¶¶ 29-30.) However, in others, the Court was unclear as to why a "lack of foundation" supposedly existed, and Defendants provided no further explanation nor filed any evidentiary materials. Defendants also did not file a motion to strike. As such, the denial does not "clearly create a genuine dispute." *Malec*, 191 F.R.D. at 584. Consequently, the Court deems admitted for purposes of L.R. 56.1 the facts Defendants purported to deny in paragraphs 12, 16, 17, 18, 19, 20, 21.

Similarly, the authority Defendants cite for disputing paragraphs 13 and 25 is insufficient for the Court to conclude the facts are disputed, and those paragraphs also are admitted. Finally, Defendants object to paragraphs 3 and 28 pursuant to, the Court suspects, Federal Rule of Evidence 602, as a result of Plaintiff's claimed lack of personal knowledge. (D.E. 32 ¶¶ 3, 28.)

3

Personal knowledge "may include reasonable inferences," but those inferences "must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). This objection is overruled: paragraph 3 is admitted as to Harris's reputation of bullying inmates, as is paragraph 28. Officer Bibbs certainly had personal knowledge as to Harris's reputation (as related in paragraph 3), and Plaintiff clearly had personal knowledge about the extent of her injury and can testify as to the extent of the injury she suffered at the hands of Harris (as addressed in paragraph 28).

B. Background Facts

By all accounts, this case in many respects presents a common deliberate-indifference-claim scenario where a plaintiff-detainee seeks to prove that a defendant-custodian failed to take protective action after the plaintiff-detainee complained of a feared threat posed by a specific person. *See Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005). Plaintiff, having been charged with possessing a controlled substance, was detained at the Cook County Jail for an undetermined period of time beginning in July 2002, including during all dates relevant to the instant opinion. (D.E. 29 ¶¶ 3-4; D.E. 30 ¶ 1.) She resided in Division 3, inside Tier A-3. (D.E. 29 ¶ 5; D.E. 30 ¶ 2.) Melissa Harris ("Harris") also was housed there. (D.E. 29 ¶ 7.) Harris had a reputation for bullying and assaulting inmates. (D.E. 30 ¶ 3.) Harris and Riley did not manifest any palpable animosity towards each other for the first several months that Riley was at the Cook County Jail. (D.E. 29 ¶ 8.) Eventually, though, Harris became very angry with Riley, possibly because Harris believed Riley had "book[ed]" her (*i.e.*, snitched on her) to the officials, even though Plaintiff had never had any fight or filed any complaint or grievance against Harris prior

4

to the events at issue. (D.E. 30 ¶ 12; D.E. 29 ¶¶ 8-10.)

During the late hours of October 3, 2002, Officer Barksdale's shift began, and she proceeded to conduct a standard inmate count. (D.E. 30 ¶ 8.) While Barksdale was counting the inmates, Harris was "going off" in her cell. (*Id.* ¶ 9.) Around 11:20 that evening, after listening to Harris's tirade and repeated threats that she would burn her cell down, Barksdale let Harris out of her cell. (D.E. 29 ¶ 13; 30 ¶ 10.) She did so despite the fact that inmates were supposed to be remain locked in their cells from lockdown time—around 9:00 or 9:30 in the evening—until it was time for breakfast. (D.E. 30 ¶¶ 6-7.) Barksdale and Harris walked down the hall from Harris's cell, past Plaintiff's cell door, where Harris (with Barksdale supposedly directly next to her) stopped long enough to demand that Plaintiff "come to the chuckhole (a hole in each cell door approximately four inches by one foot)." (D.E. 30 ¶¶ 11-13; D.E. 29 ¶ 14.) Harris then confronted Barksdale, demanding that Barksdale "pop the lock" of Riley's cell, and Barksdale responded that she could not do so. (D.E. 30 ¶¶ 14-15.) Harris then informed Barksdale that "when the door is popped for breakfast, I'm going to fuck that bitch [Riley] up." (*Id.* ¶ 16.) Barksdale responded, "Come on Melissa," and the two walked away. (*Id.*)

Harris came back to Riley's cell about thirty or forty-five minutes later, and she again demanded that Riley get out of bed and come to the chuckhole. (*Id.* ¶ 18.) When Riley refused to do so, Harris waited outside Riley's cell door and eventually got a chair and sat outside the door for an extended period of time. (*Id.*) While Harris was waiting outside Riley's door, Officer Barksdale apparently allowed her to remain outside of her cell at her convenience and even asked Harris if she was alright. (*Id.* ¶ 19.) Leaving Harris unsupervised at night in this manner was not permitted under the standard procedures of the Cook County Jail. (*Id.* ¶¶ 6-7.)

5

Around 4:00 in the morning, the cell doors were opened for breakfast. (*Id.* ¶ 22.) Apparently, by this time Harris was no longer waiting outside Plaintiff's cell. Although Riley was nervous about leaving her cell, her status as a "team leader" required her to leave the cell to complete certain paperwork. (*Id.*) Upon returning from breakfast, Riley's cellmate informed her that Harris was outside the door waiting for her. (*Id.* ¶ 23.) Harris then entered Riley's cell and began yelling at her; the confrontation in the cell culminated with Harris swinging at Plaintiff, but Harris only struck a glancing blow. (*Id.* ¶ 24.) Riley was able to get past Harris, escape the cell, and enter the dayroom. (*Id.* ¶ 25; D.E. 29 ¶ 16.)

Neither Officer Barksdale nor Officer Vargas were in the dayroom, but Officer Vargas was located in the interlock, which is adjacent but separate to the dayroom—with a large, solid door separating the two. (D.E. 29 ¶¶ 18-19; D.E. 30 ¶ 25.) Apparently this door has some amount of glass in it such that someone inside the interlock can look into the dayroom. (D.E. 30, Ex. A at 46.) Riley went to the door separating the interlock from the dayroom and waived her arms at Vargas, trying to get her attention. (*Id.* ¶ 25.) She also began shaking the door and yelling, "Please, let me out of here." (*Id.*) (It is unclear what this door specifically looks like or how likely it was, if it all, that Vargas could hear the pleas, but this ambiguity cuts against the defendant/non-movants at this stage of the litigation.)

While Riley was facing the door, Harris approached her from behind and beat Riley furiously, until she ultimately lost consciousness. (*Id.* ¶¶ 26-27; D.E. 29 ¶ 18.) The beating may have involved up to twenty blows. (D.E. 30 ¶ 27.) A prison official, a captain, soon arrived on the scene and had Plaintiff taken to the Division 3 medical unit. (D.E. 29 ¶ 20.) Apparently, Riley suffered damage to her face and eye and has suffered blurred vision as a result of the

incident. (D.E. 30 ¶ 28.) As a result of this incident and the resultant investigation, Officer Barksdale was terminated from her position at the Cook County Jail. (*Id.* ¶ 31.) On August 21, 2003, Plaintiff filed this complaint in federal court.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact, *see Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere "metaphysical doubt as to the material facts" does not amount to a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *See* Fed R. Civ. P. 56(c); *see also Foley* 359 F.3d at 928. However, the Court is "not required to draw every conceivable inference from the record." *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)). Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th

7

Cir. 2004). The party opposing summary judgment may not rest upon the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 248. There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*

## III. DISCUSSION

Technically speaking, whether a claim such as the one in the instant case is predicated on the Fourteenth Amendment's Due Process Clause or the Eighth Amendment depends on whether the plaintiff is a pretrial detainee or already has had her case adjudicated and is serving her sentence. There is, however, "little practical difference between the two standards." *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001) (internal citations omitted). Thus, the standard set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994), is applicable to this case. *See Mayoral*, 245 F.3d at 938.

Plaintiff claims that Defendants failed to protect her from an assault and resultant harm. Specifically, she maintains that Barksdale failed to protect her from a known, foreordained harm from Melissa Harris. The allegation against Vargas is more appropriately characterized as a failure to intervene, in that Vargas allegedly actively ignored Riley's pleas for help and stood by while Harris pummeled Riley. *See, e.g., Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). The standard the Court applies is the same in both cases. *See, e.g., id.* (applying *Farmer* standard in a failure to intervene case); *Velez v. Johnson*, 395 F.3d 732, 735 (7th Cir. 2005) (applying *Farmer* standard in a Barksdale-like failure to protect case); *Pharaoh v. Manning*, 92 C 7491, 1996 WL 82464, at *2 (N.D. Ill. Feb. 23, 1996) (Holderman, J.) (applying *Farmer* standard for a similar failure to intervene case).

Precedent teaches that the Constitution imposes upon prison officials the duty to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *see also Mayoral*, 245 F.3d at 938. In particular, this duty requires prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotations omitted). To establish a failure to protect claim, a plaintiff-inmate must show that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) defendant-officials acted with "deliberate indifference" to that risk. *Id.* at 834; *see also Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005).

The first prong of a failure-to-protect claim—considered the objective prong—requires a plaintiff to allege that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. To satisfy this prong, a plaintiff must "allege not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that serious harm might actually occur." *Brown*, 398 F.3d at 910. Under this standard, precedent teaches that a beating suffered at the hands of a fellow detainee "constitutes serious harm," as "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 910-911 (quoting *Farmer*, 511 U.S. at 834).

To meet the second, subjective prong of a failure to protect claim, "a plaintiff must establish his custodians' deliberate indifference to that substantial risk of serious harm. As stated in *Farmer*, 'a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which an inference could be drawn that a substantial risk of

9

serious harm exists, and he must also draw the inference.'" *Id.* at 913 (internal citations omitted). Defendants, however, are not required to ensure a prison inmate's safety categorically, and "[t]he existence or possibility of other better policies which might have been used does not necessarily mean that the [the officers were] being deliberately indifferent." *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002) (citation omitted). Thus, the deliberate indifference prong carries two separate and distinct elements: knowledge of risk and a disregard of that risk.

A prisoner usually proves that jail officials knew of a risk in one of two ways: by showing that he alerted prison officials of the threat, *James v. Milwaukee County*, 956 F.2d 696, 700 (7th Cir. 1992), or by showing that the risk was so substantial that the officials' knowledge can be inferred. *Farmer*, 511 U.S. at 842; *accord Perez v. Velasco*, No. 98 C 8018, 2001 WL 844496, at *4 (N.D. Ill. July 23, 2001). For a risk to be obvious, a prisoner must show that the risk was "long-standing, pervasive, well-documented, or that it has been expressly noted by prison officials in the past." *Farmer*, 511 U.S. at 842. A plaintiff must also demonstrate that the defendant(s) disregarded that known risk.

In the instant case, a jury could conclude that Plaintiff faced a substantial risk of serious harm. It is uncontroverted that Plaintiff was beaten into unconsciousness and suffered facial damage at the hands of Melissa Harris, and Harris had a reputation for violent and assaultive behavior. Furthermore, after the summary judgment briefing cycle, there remains a material issue of fact concerning whether Barksdale and Vargas knew of the risk to Plaintiff. As to Barksdale, testimony from Riley's deposition (admitted for the purposes of summary judgment due to Defendants' failure to comply with L.R. 56.1) demonstrates that Officer Barksdale was present for Harris's repeated and specific threats towards Riley. Barksdale also allowed Harris to

take the extraordinary step of sitting unsupervised at length in front of the door to Riley's cell less than an hour after Harris had threatened Riley and while prisoners were supposed to all be in their cells. (*Id.* ¶¶ 6-7, 18-20.) In fact, Barksdale even checked on Harris's well-being during her unsupervised time in front of Riley's cell. (D.E. 30 ¶¶ 18-20.) Most importantly, Harris informed Barksdale directly that she intended to harm Riley—she even told Barksdale exactly when she intended to do so. (*Id.* ¶ 15.) Barksdale had knowledge of the heightened risk to Riley directly "from the horse's mouth," and as such satisfies the first part of the deliberate indifference test.

Vargas, meanwhile, has not provided the Court with enough information to conclude that there is no material issue of fact as to her knowledge (or lack of knowledge) of an imminent threat to Riley's physical safety and Vargas's ability to assist Riley. Riley's account, if credited, included testimony that indicated that Vargas would have been able to see (and likely hear) Riley's calls for help. She also should have been able to see (and possibly hear) Melissa Harris pummel Erin Riley, punching her at least twenty times. (*Id.* ¶ 27.) The door separating the interlock—where Vargas was located when Riley attempted to escape from Harris's impending attack—from the day room had glass in it in such that someone situated inside the interlock could see into the day room. (*Id.*, Ex. A at 46-47.) Moreover, Riley indicated that Vargas saw her asking for help, and Vargas "just [sat] there looking at me." (*Id.* at 46.) Defendants have offered no evidence to contradict the logical conclusion from this information that an issue of fact exists as to whether Vargas had knowledge of Riley's distress. In fact, Defendants only assert that the door separating the interlock from the day room is a "big solid door," without providing any information about the ability to see or hear activities on the other side of the door. (D.E. 29 ¶

18.) Nor is there any evidence (such as even an affidavit from Vargas) to suggest that Vargas was unaware of Riley's plight; there has been no indication from Defendants that Vargas did not or could not hear or see Riley's pleas for help.

Next the Court considers whether sufficient facts exist to conclude either Vargas or Barksdale disregarded the risk to Riley. Vargas has provided no indication that if she knew of the risk—and the Court finds there is a material issue of fact as to whether she did—she did not disregard that risk. In other words, Riley's testimony that Vargas just stared at her and did nothing while Riley requested assistance and was struck repeatedly by Harris is at least sufficient to create a question of fact to be determined by a jury.[2]

There also is evidence that, if credited, would indicate that Barksdale disregarded the risk to Riley. In the hours before Riley was beaten, Barksdale did keep Harris away from Riley's cell door once, when she led Harris away from the front of Riley's cell at approximately 11:15 p.m. (D.E. 30 ¶¶ 10-16.) However, Barksdale apparently also allowed Harris to wait, unsupervised, outside of Riley's door, in violation of jail rules concerning procedures at night. (*Id.* ¶¶ 6-7.) Moreover, the facts indicate that Barksdale knew that Harris wanted to assault Riley, and she also knew exactly when Harris planned to attack her. (*Id.* ¶ 16.) Unlike many—arguably most—of

---

[2] Some courts have held that prison guards have no duty to intervene in an assault of an inmate when intervention would place the guards in danger of physical harm. *See, e.g., Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995); *Lacy v. Berge*, 921 F. Supp. 600, 609 (E.D. Wis. 1996). This argument is inapposite to the instant case. First and foremost, Defendants have not offered this argument in their abbreviated briefing concerning Vargas's involvement in the case, thus the argument is waived, at least for purposes of summary judgment. Second, nothing in the record presented, nor in the briefing, indicates that Vargas would have placed herself in harm's way by providing Riley assistance, specifically a means of escaping the day room. There is, however, testimony that if credited could suggest that Vargas could have ended the fight sooner. *Compare Lacy*, 921 F. Supp. at 609.

the prisoner protection cases the Court has encountered, *see, e.g., Butera v. Cottey*, 285 F.3d 601 (7th Cir. 2002); *Jelinek v. Greer*, 90 F.3d 242 (7th Cir. 1996); *Perez*, 2001 WL 844496, the facts in the instant case, as taken in the light most favorable to Plaintiff, create a genuine issue of fact as to whether Officer Barksdale had notice of a specific and heightened threat to Riley. In addition, there is evidence that suggests that Harris had a reputation for violence; there also is no evidence, for example, that Harris routinely made baseless threats or that threats of violence were so commonplace in the women's area of the Cook County Jail that one might reasonably not consider them, without more, to be meaningful or noteworthy.

On the facts presented, the Court also does not believe the case should be taken from the jury simply because Riley did not actually complain, request assistance, or otherwise vocalize the risk to her or her desire for an intermediary. It was apparent to Barksdale (at least crediting Plaintiff's evidence) that a conflict existed between Riley and Harris, and that Harris intended to escalate the severity of the conflict on the morning of October 4, 2002. *Compare Velez*, 395 F.3d at 736. Precedent teaches that "[w]hat matters is that [Barksdale] was aware of a serious risk of harm in some form" by virtue of Harris's statements, at a specific time, that actually occurred, and Barksdale arguably did nothing to prevent it. *Id.*

In light of Plaintiff's proffered evidence and Defendants' failure to demonstrate sufficiently the absence of a material issue of fact as to Defendants' deliberate indifference toward Riley's safety, the Court denies Defendants' motion for summary judgment.[3]

---

[3] Defendants offered no argument as to why Count II, which alleges a failure to provide medical care, should be dismissed. *See generally Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976) (holding that Eighth and Fourteenth Amendment impose a duty upon the states to provide adequate medical care to incarcerated individuals); *Walker v. Benjamin*, 293 F.3d 1030, 1036-37 (7th Cir. 2002) (deliberate indifference to prisoners' serious medical needs violated the Eighth

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied.

So Ordered.

_Mark Filip_
Mark Filip
United States District Judge
Northern District of Illinois

Dated: 6-13-05

---

Amendment) (citing *Estelle*, 429 U.S. at 104-05).